Elizabeth WEAVER and Richard Weaver,
Appellants–Plaintiffs,

v.

Dr. Earle ROBINSON, Dr. Louis Star, Dr. Alan Patterson, Dr. Betty Raney, Dr. Keltner, Methodist Hospital of Indiana, and MetroHealth, Appellees–Defendants.

No. 30A01–9212–CV–413.

Court of Appeals of Indiana,
First District.

July 6, 1993.

Patrick M. O'Brien, Alastair J. Warr, Brett R. Fleitz, Steers Sullivan McNamar & Rogers, Indianapolis, for appellants-plaintiffs.

Douglas J. Hill, Joyce A. Dietz, Hill, Fulwider, McDowell, Funk & Matthews, Indianapolis, for Methodist Hosp. of Indiana, Inc. and Betty Raney, M.D.

Robert G. Zeigler, David D. Becsey, LaCava, Zeigler & Carter, Indianapolis, for Louis Star, M.D.

NAJAM, Judge.

### STATEMENT OF THE CASE

Elizabeth and Richard Weaver ("Weavers") appeal from summary judgments entered in favor of defendant doctors and health care providers in a medical malpractice action arising from a laparoscopy examination which the Weavers alleged was negligently performed on Elizabeth. We affirm.

### ISSUES

We restate the issues presented on appeal as:

1. Did the trial court properly grant summary judgment in Dr. Raney's favor where the Weavers presented no expert testimony

showing that Dr. Raney's conduct fell below the applicable standard of care?

2. Did the trial court properly grant summary judgment in Dr. Star's favor where there was no genuine issue of material fact regarding a lack of proximate cause between Dr. Star's conduct and Elizabeth's injuries?

3. Did the trial court properly grant summary judgment in Methodist Hospital's ("Hospital") favor where the undisputed facts showed that Dr. Robinson was not acting as the Hospital's employee when he performed surgery on Elizabeth?

### FACTS

Elizabeth had a hysterectomy at the Hospital in 1985. In 1988, she suffered from pelvic and abdominal pain and was readmitted to the Hospital for additional treatment. It is this period of follow-up treatment at the Hospital which forms the basis of Elizabeth's suit against the Hospital and various physicians.

On October 4, 1988, Elizabeth underwent a pelviscopy with lysis of adhesions to remove scar tissue. This surgery was performed by Dr. Patterson who was assisted by Dr. Robinson, pursuant to a consent form which Elizabeth signed. When the doctors began their exploration of Elizabeth's abdomen, they discovered adhesions in several places. Following surgery, Elizabeth was admitted as an inpatient for observation. Two days later, Dr. Patterson found that Elizabeth's abdomen was nontender, and that she was eating and excreting well. Thus, Dr. Patterson dismissed Elizabeth in the morning of October 6, 1988.

Later on October 6, 1988, Elizabeth was readmitted to the Hospital by Dr. Star. Elizabeth was complaining of abdominal pain, nausea, and vomiting, and had a fever of 102°F. Dr. Star ordered X-rays and laboratory tests, and spoke with Dr. Patterson that evening regarding Elizabeth's condition. Dr. Patterson was unable to see Elizabeth, but he contacted Dr. Robinson on October 7, 1988, and asked him to examine Elizabeth since he had assisted Dr. Patterson in her pelviscopy.

Dr. Robinson examined Elizabeth in the morning of October 7, 1988. His progress report stated that Elizabeth required a surgical consultation, that is, an examination by a general surgeon to determine whether further surgery was necessary. Later that afternoon, Dr. Willie Cochran[1] performed a surgical consult on Elizabeth. In his progress note, Dr. Cochran indicated that Elizabeth's condition would be monitored with serial examinations. Later that day, Dr. Marshall Keltner[2] examined Elizabeth as part of his routine rounds of MetroHealth patients at the Hospital, and he noted that Elizabeth should continue under observation.

On October 8, 1988, at 1:30 a.m., the nursing staff called Dr. Raney when they noted that Elizabeth's temperature was 101.2°F. Dr. Raney examined Elizabeth, noted that she continued to experience abdominal pain, and spoke with Dr. Keltner regarding Elizabeth's condition. Dr. Patterson examined Elizabeth at 7:30 a.m. later that morning. Dr. Cochran examined Elizabeth shortly thereafter, and noted that she had a possible perforated viscus. At 9:00 a.m. Elizabeth had an exploratory laparotomy, performed by Dr. Cochran assisted by Dr. Patterson. During this surgery, the physicians discovered that Elizabeth had an abdominal infection and a perforated sigmoid colon on the right side, and they performed a temporary sigmoid colostomy. Elizabeth remained in the Hospital following the surgery until October 25, 1988. Upon her discharge, Elizabeth's abdominal wounds were healing well, and she was walking well and tolerating a regular diet. Elizabeth had to use and maintain the colostomy until March of 1989.

Elizabeth filed a proposed complaint in negligence against the Hospital, Dr. Robinson, Dr. Star, Dr. Patterson, Dr. Raney, Dr. Keltner, and MetroHealth with the Indiana Department of Insurance. The Medical Review Panel ("Panel") issued its unanimous opinion on September 18, 1991, which concluded that there was an issue of material

---

**1.** Dr. Cochran is not a party to this action.

**2.** Dr. Keltner has been dismissed with prejudice from this action by stipulation of the parties. *See* Record at 111.

fact, not requiring expert opinion, bearing on liability for consideration by the court or jury, regarding whether Dr. Patterson obtained an informed consent from Elizabeth, but found that the evidence did not support the conclusion that any of the other defendants failed to meet the applicable standard of care. Record at 58. The Weavers filed their complaint in the trial court on November 19, 1991.[3]

Dr. Star moved for summary judgment on January 13, 1992. Dr. Raney and the Hospital moved for summary judgment on January 21, 1992. These defendants designated the Panel's opinion and additional affidavits in support of their motions. The Weavers also designated affidavits in opposition to the motions. The trial court granted Dr. Star's motion on September 1, 1992, and Dr. Raney and the Hospital's motion on September 11, 1992.[4] The Weavers appeal. We will state additional facts as needed in our discussion.

## DISCUSSION AND DECISION

### Standard of Review

When reviewing the propriety of a ruling on a motion for summary judgment, this court applies the same standard applicable to the trial court. *Houin v. Burger* (1992), Ind.App., 590 N.E.2d 593, 596, *trans. denied.* We must consider the designated evidentiary matter sanctioned by Indiana Trial Rule 56(C) without determining its weight or credibility. *Id.* Summary judgment should be granted only if such evidence shows that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* The movant bears the burden of proving the propriety of summary judgment, and all facts and inferences to be drawn therefrom are viewed in a light most favorable to the non-moving party. *Id.* Summary judgment will be affirmed on appeal if it is sustainable on any theory or basis found in the evidentiary matter designated to the trial court. T.R. 56(C).

### Issue One: Dr. Raney's Conduct

Elizabeth claims that the trial court erred in granting Dr. Raney's summary judgment motion because Elizabeth presented expert testimony showing that Dr. Raney's conduct fell below the applicable standard of care, thereby creating an issue of material fact. We disagree.

In a medical malpractice action based upon negligence, a plaintiff must establish: the defendant's duty in relation to the plaintiff; the defendant's failure to conform its conduct to the requisite standard of care required by the relationship forming the duty; and, an injury to the plaintiff resulting from that failure. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 190. The standard of care is that degree of care, skill and proficiency exercised by reasonably careful, skillful, and prudent practitioners in the same class acting under the same or similar circumstances. *Vergara v. Doan* (1992), Ind., 593 N.E.2d 185, 187. To establish a *prima facie* case of medical malpractice, a plaintiff must provide expert testimony showing that the physician's performance fell below the applicable standard of care. *Kerr v. Carlos* (1991), Ind.App., 582 N.E.2d 860, 863. That is, the expert must explain how the defendant breached the standard of care and assert that his negligence in doing so was a proximate cause of the plaintiff's injuries. *Bethke v. Gammon* (1991), Ind.App., 590 N.E.2d 573, 574–75. In the absence of such expert evidence, there is no genuine issue of material fact for a jury and summary judgment is appropriate. *Stackhouse v. Scanlon* (1991), Ind.App., 576 N.E.2d 635, 639, *trans. denied.*

Here, Elizabeth failed to provide the necessary expert evidence showing that Dr. Raney's conduct fell below the required standard. Elizabeth points to the affidavits of her experts, Dr. Portman and Dr. Barnes, as making the necessary showing of negligence. However, these affidavits do not state that Dr. Raney's conduct fell below the required

---

**3.** Richard Weaver joined his claim for loss of consortium with Elizabeth's negligence counts. We do not address the merits of his claim since it is derivative of Elizabeth's claims.

**4.** The Weavers' claims against Dr. Robinson and Dr. Patterson are pending.

standard of care. Rather, both experts' affidavits show that any misgivings they had about Elizabeth's care after her readmission to the Hospital on October 6, were concerned with the physician who readmitted her, Dr. Star, and not with Dr. Raney, who examined Elizabeth only once, at approximately 1:30 a.m. on October 8, after she had already had a surgical consultation with Dr. Cochran. For example, Dr. Barnes stated that there was an "unnecessary delay from the time that [Elizabeth] complained of the symptoms until the time that a general surgical consultation was obtained," but also stated that the general surgeon, Dr. Cochran, "handled the situation appropriately." Record at 108–09. As Dr. Raney observed, she examined Elizabeth *after* Dr. Cochran's surgical consultation. Therefore, Dr. Barnes' affidavit fails to show that Dr. Raney failed to meet the applicable standard of care.

Similarly, Dr. Portman's affidavit does not support Elizabeth's position. Dr. Portman opined that Elizabeth should have received a "surgical consultation immediately upon [her] readmission," and that the admitting physician's "failure to immediately obtain a surgical consultation fell below the applicable standard of care." Record at 212–13. Again, these statements refer to treatment that Elizabeth received or failed to receive upon her readmission to the Hospital, and not to Dr. Raney's later examination of Elizabeth.

■ Moreover, Dr. Raney presented a unanimous opinion from the Panel stating that her conduct in treating Elizabeth met the applicable standard of care. *See* Record at 57–58. Where there is a unanimous medical review panel determination favoring the defendant and no countervailing expert opinion, the defendant is entitled to a judgment as a matter of law. *McGee v. Bonaventura* (1993), Ind.App., 605 N.E.2d 792, 794. That is precisely the situation here. Elizabeth failed to provide a countervailing expert opinion demonstrating that Dr. Raney's conduct fell below the applicable standard of care in opposition to the Panel's opinion offered by

Dr. Raney, which negated any negligence on her part. The trial court properly granted Dr. Raney's summary judgment motion.

### *Issue Two: Dr. Star's Conduct*

Next, Elizabeth argues that she demonstrated disputed issues of material fact regarding the causal nexus between Dr. Star's conduct and her injuries, and, therefore, that summary judgment in Dr. Star's favor was improper. We find that the trial court did not err.

■ Dr. Star produced the unanimous opinion of the Panel stating that Dr. Star's conduct did not fall below the applicable standard of care. *See* Record at 57–58. However, Elizabeth again relies on the opinions of her experts, Dr. Portman and Dr. Barnes, to refute the Panel's opinion and to show an issue of material fact regarding whether Dr. Star's conduct proximately caused her injuries. Our examination of these affidavits shows that they fail to allege a causal link between Dr. Star's conduct and Elizabeth's injuries.

Both of the affidavits allege that Dr. Star's conduct fell below the requisite standard of care because a surgical consult should have been obtained upon Elizabeth's readmission to the Hospital. Record at 108–09 and 212–13. Therefore, we disagree with the trial court's Conclusion of Law Number 2 because Elizabeth did produce competent medical testimony showing that Dr. Star's conduct fell below the applicable standard of care. *See* Record at 229. However, these allegations are insufficient to carry Elizabeth's burden in withstanding Dr. Star's summary judgment motion because there is no assertion in either affidavit of the required causal link between Dr. Star's conduct and Elizabeth's ultimate injuries. *See Bethke,* 590 N.E.2d at 575.

Dr. Portman's affidavit states that the admitting physician, Dr. Star,[5] failed to obtain a surgical consultation upon Elizabeth's readmission, and that this omission fell below the requisite standard of care. *See* Record at

---

5. Dr. Star makes much of the affidavit's failure to mention him by name as the admitting physician. However, because we decide that the affidavit fails to show causation, we need not address this contention.

212–13. However, Dr. Portman's affidavit does not allege that Dr. Star's conduct caused Elizabeth's injuries. Without showing a causal link between a breach of duty and the resulting injury, Elizabeth's negligence claim fails at the summary judgment level. As we have already stated in *Issue One,* the expert must allege not only that the standard of care was breached but also that the negligent breach was a proximate cause of the injuries complained of. *See Bethke,* 590 N.E.2d at 574–75. Where, as here, no such showing has been made, there is no genuine issue of material fact on the question of causation, and summary judgment is appropriate.

Elizabeth asserts that Dr. Portman's affidavit and Dr. Barnes' affidavit, when taken together, show proximate cause. We disagree. Dr. Barnes' affidavit does address the issue of causation, but it is inadequate to show that Dr. Star's failure to obtain a surgical consultation immediately upon Elizabeth's readmission caused her injuries. In his affidavit, Dr. Barnes states that had Dr. Cochran been called earlier for the purpose of evaluating Elizabeth's condition, "the bowel could have been handled primarily and the need for a colostomy may well have been avoided." *See* Record at 109. However, Dr. Barnes also states that when Dr. Cochran was called upon, he "handled the situation appropriately." *See* Record at 109. Dr. Cochran treated Elizabeth in the same way that Dr. Star had upon her readmission, that is, he waited to see if her condition would stabilize or deteriorate, possibly necessitating exploratory surgery. When Dr. Cochran examined Elizabeth on October 7, his opinion was that surgery was not required, and Dr. Barnes agreed with that decision.

The only permissible inference which can be drawn from the undisputed facts and from the affidavits is that Dr. Star's wait-and-see approach was appropriate, that Elizabeth did not develop the signs and symptoms of an acute intra-abdominal crisis until October 8, and that only then was surgical intervention indicated. In sum, Dr. Star and Dr. Cochran followed the same course of conservative treatment. Thus, Dr. Star's decision upon Elizabeth's readmission on October 6 not to order surgery or other treatment cannot be causally connected to Elizabeth's ultimate injuries, because Dr. Star's diagnosis occurred the day before Dr. Cochran's diagnosis. Although Dr. Star failed to consult immediately with a general surgeon, there is no competent evidence that the delay caused or otherwise contributed to Elizabeth's injuries. Because she failed to show a causal nexus between Dr. Star's conduct and her injuries, Elizabeth's claim will not withstand summary judgment. *See Brewster v. Rankins* (1992), Ind.App., 600 N.E.2d 154, 156 (summary judgment affirmed if sustainable on any theory or basis found in record).

### *Issue Three: Hospital's Relationship to Dr. Robinson*

Finally, Elizabeth contends that summary judgment was improperly granted in the Hospital's favor because there are disputed issues of material fact regarding the Hospital's relationship to Dr. Robinson when he treated Elizabeth. We find that summary judgment was proper.

A hospital cannot legally practice medicine. *South Bend Osteopathic Hospital, Inc. v. Phillips* (1980), Ind.App., 411 N.E.2d 387, 389, *trans. denied.* Physicians employed by a hospital and furnished by the hospital to its patients remain independent contractors and thus are personally liable for malpractice. *Ross v. Schubert* (1979), 180 Ind.App. 402, 408, 388 N.E.2d 623, 628, *trans. denied.* However, a hospital may be responsible for its staff physicians' negligence if the hospital is aware that the care a physician is providing has deviated from normal practice. *Yaney v. McCray Memorial Hospital* (1986), Ind.App., 496 N.E.2d 135, 137. Further, where the usual requisites of agency or an employer/employee relationship exist, a corporation may be held vicariously liable for malpractice for the acts of its employee-physicians. *Sloan v. Metropolitan Health Council* (1987), Ind.App., 516 N.E.2d 1104, 1109. Elizabeth must show issues of material fact regarding Dr. Robinson's employment status vis-a-vis the Hospital. We find that she has not sustained this burden.

Elizabeth has not shown that Dr. Robinson was acting within the scope of his

employment with the Hospital when he treated her. Dr. Robinson was employed by the Hospital in a limited teaching capacity and also conducted a private gynecology practice in which he performed various surgeries. The Record shows that Dr. Robinson was present at the Hospital to assist Dr. Patterson with Elizabeth's pelviscopy on October 4 and examined Elizabeth at Dr. Patterson's request when Dr. Patterson was unable to see her on October 7. However, Dr. Robinson's presence at the Hospital performing medical tasks does not automatically equate to employee status in relation to the Hospital. The designated materials show that Dr. Robinson was performing, and was paid for, services for Elizabeth pursuant to his private gynecology practice as a surgeon, not as the Hospital's employee using the videotape of Elizabeth's surgery for teaching purposes as Elizabeth now asserts.[6] *See* Record at 209, 267–68, 281, 434, and 556. Thus, Dr. Robinson was an independent contractor when treating Elizabeth and any alleged negligence he committed may not be imputed to the Hospital. The trial court properly granted Hospital's summary judgment motion.

Because there were no genuine issues of material fact regarding Elizabeth's claims against Dr. Raney, Dr. Star, and the Hospital, we affirm the trial court's grant of summary judgment for these defendants.

Affirmed.

ROBERTSON, J., concurs.

SHARPNACK, C.J., concurs in part and dissents in part with separate opinion.

SHARPNACK, Chief Judge, concurring in part and dissenting in part.

Although I concur with the majority in affirming the summary judgments as to Dr. Raney and the hospital, I cannot agree as to Dr. Star and, as to his summary judgment, I dissent and would reverse.

My disagreement with the majority concerns what reasonably may be inferred from Dr. Barnes' affidavit on the issue of a causal link between Dr. Star's failure to obtain a surgical consult immediately upon seeing Mrs. Weaver and her injuries.

Dr. Barnes without question tells us that Dr. Cochran "handled the situation appropriately" when, after being called in for consult *twelve hours* after admission, he waited before employing surgery. It does not follow necessarily, however, that Dr. Star's *failure* to obtain a surgical consult immediately upon admission had no causal connection to Mrs. Weaver's injuries. Dr. Barnes' affidavit continues from his approval of Dr. Cochran's conduct:

> "It is my opinion that had he been called earlier for the purpose of evaluating [Mrs. Weaver] when the perforation was early, the bowel could have been handled primarily and the need for a colostomy may well have been avoided. In fact, there is a very good probability that that colostomy could have been avoided. All the additional morbidity that this woman suffered was caused by the delay in obtaining a proper consultation."

I cannot read that language to mean other than that at least the colostomy very probably would have been avoided if Dr. Star had gotten a consult from Dr. Cochran, or some general surgeon, when Dr. Star first began to follow Mrs. Weaver. The fact that *twelve hours later* waiting was appropriate does not alter the clear import of the quoted portion of Dr. Barnes' affidavit.

The affidavit of Dr. Barnes would support an inference that as a matter of fact the failure of Dr. Star to obtain an immediate surgical consult caused Mrs. Weaver to suffer injuries greater than she would have otherwise suffered. That is enough to get past a summary judgment motion and get to trial.

I would reverse as to Dr. Star.

---

**6.** In 1988, most surgeries like Elizabeth's were videotaped and later used for the Hospital's teaching purposes. *See* Record at 272–73.